# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK HALUSKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:13-cv-1104 |
| v. | ) |
| | ) |
| ADVENT COMMUNICATIONS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is a MOTION FOR SUMMARY JUDGMENT (ECF No. 31) filed by Defendant Advent Communications, Inc. ("Advent") with a brief in support (ECF No. 32). Plaintiff Mark Haluska has filed a brief in opposition (ECF No. 35); Advent has filed a reply brief (ECF No. 38). The summary judgment record has been fully developed via the submission of Advent's Concise Statement of Material Facts ("CSMF") (ECF No. 33) and Appendix (ECF No. 34); Plaintiff's Response to Advent's CSMF (ECF No. 36) and Appendix (ECF No. 37); and Advent's Response to Plaintiff's Additional Material Facts (ECF No. 39). The Court heard oral argument on October 7, 2014 at which Advent presented a Bench Memorandum (ECF No. 50) regarding the "computer professional" exemption. No response has been filed. The issues have nevertheless been fully briefed. Accordingly, the motion is ripe for disposition.

### I. Background

The following background is taken from the Court's independent review of the motion for summary judgment, the filings in support and opposition thereto, and the record as a whole. As the law requires, all disputed facts and inferences are resolved in favor of Plaintiff, the non-moving party.

Co-owned by Gregory Sinnamond and Kenneth Eglberger, Advent is in the business of installing, upgrading, and maintaining voice and data systems for commercial clients. The installation of the products sold by Advent (*e.g.*, Avaya telephone systems) requires knowledge, experience and skills in computer networks, programming, and the manipulation of software.[1]

Around mid-2010, Advent IT Director William Weisser recommended to Eglberger that he consider his friend, Mark Haluska, for employment. Haluska had previously worked as a Telecom Administrator at AmWINS and as an IP Office Engineer at Voda One and earned two

---

1. There is a disagreement over the meaning of the term "programming" as used by Advent employees. Plaintiff submits the Declaration of former Advent General Manager Gregory Pack in which he asserts:

> When I was employed at Advent, *many of the senior technicians performing the work similar to* Mark Haluska's had no computer systems or computer programming experience and were not proficient in any way with computers. Advent's installation technicians selected available options within the Avaya software necessary to route calls and provide answering options in the manner selected by the customers. When Advent employees refer to "programming" software, they are referring to this type of data entry rather than actual software modification. The installation technicians enter the data into existing Avaya software to take advantage of the way the software operates.

Decl. of Pack, Pl.'s Ex. 4 at 2, ECF No. 37-4 (emphasis added). However, in his deposition, Pack seems to have altered his account as it relates to Haluska—not those technicians who performed similar work. For example, the following exchange occurred at Pack's deposition just months before he signed his Declaration:

> Q. Now you indicated Mark had abilities to address software problems; is that correct?
> A. Yes
> Q. So if the software needed to be reconfigured or redesigned in some fashion to fit the system, Mark had the ability to do that; is that right?
> A. We weren't changing the software. So the question is kind of unanswerable.
> Q. So are you stating that you popped a disk in, and that was the end of it?
> A. No.
> Q. Modifications had to be made to fit the particular systems, didn't it?
> A. Yes.
> Q. And those modifications are within the skill set of guys like Mr. Haluska and Mr. Weisser; is that right?
> A. Yes.
> Q. And are you saying that Mr. Haluska never used his skill set to apply those modifications to software.
> A. No. He did.

Dep of Pack, Pl.'s Ex. 3 at 141, ECF No. 37-3. *See also id.* at 21, 142-43, 169-70; Dep. of Weisser, Def.'s Ex. C at 54-58, ECF No. 34-3 at 5. A non-moving party cannot create a genuine issue of material fact in order to defeat summary judgment by submitting an affidavit which contradicts his or her own prior deposition testimony. *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). The Court credits Pack's deposition testimony to the exclusion of his Declaration insofar as they are in conflict. *See Smith v. City of Allentown*, 589 F.3d 684, 688 n.2 (3d Cir. 2009).

Associates Degrees from Pittsburgh Technical Institute: one in Specialized Technology, with a focus in Computer Networking Systems Technology; and another in Computer and Network Security & Forensics. Weisser apparently endorsed Haluska because of his experience installing Avaya telephone systems rather than his technical training or proficiency with computer systems. From Eglberger's perspective, Advent ultimately decided to employ Haluska because of his advanced computer skills and his experience in installing voice and data systems.

### 1. Job Responsibilities

Haluska was hired as a "senior" or "lead" technician in August 2010. On August 30, 2013, Haluska signed an employment contract which provided him with a set salary of $73,000, moving expenses of $1,500.00, four months of paid rent at $450.00 per month, and commission on any work received form his previous employer AmWINS.[2] Haluska later received an increase in his salary to $75,250 per year in December 2012 and another raise to $85,000 per year in March 2013 after he negotiated with then-Advent General Manager Gregory Pack.[3] Throughout his employment, Haluska was interchangeably referred to as a "voice engineer," "lead engineer," "senior engineer," "senior technician," "lead tech," and "voice engineer."

As a "lead technician," Haluska would first meet customers along with Advent project managers at "precut meetings" during which he would gather information, discuss phone system

---

2. Plaintiff denies this fact even though Advent has included a signed copy of the Employment Agreement. *See.* Def. Ex. E / Pl.'s Dep. Ex. 4, ECF No. 34-5. In support of his denial, Plaintiff cites an e-mail exchange between Haluska, Eglberger and Sinnamond in which they discuss his starting salary of "65k" or "75k" as well as benefits / moving expenses. Moreover, Plaintiff asserts that "[t]he written employment contract was signed shortly after [he] commenced his employment and it contained some terms that [he] was not aware of." Pl.'s Resp. at 2, ECF No. 36. Those contentions do not create genuine disputes of material fact.

3. In early-2013, Haluska told Pack that he wanted Advent to pay him overtime compensation. *See* Dep. of Pack, Pl.'s Ex. 3 at 109-112, ECF No. 37-3. Around this time, Pack, Eglberger and Sinnamond also began to discuss overtime compensation for salaried employees after Pack attended a management training class at which the presenter discussed common employer issues, including wage and hour exposure. *See id*. at 114-24. At the direction of Eglberger, Pack provided him with an analysis of the overtime hours worked by Advent employees and the economic impact on its payroll if it paid overtime compensation to salaried employees. *See id.* at Dep. Ex. 32, ECF No. 37-3 at 16-17. Pack later provided this documentation to Haluska after he expressed some frustration as to his compensation. *See id.* at 119-24.

programming, estimate the scope and timing of the job, and make recommendations regarding call flows and hardware integration of voice and data systems. *See* Dep. of Haluska, Def.'s Ex. D at 161-64, ECF No. 34-4; Dep. of Pack, Def.'s Ex. G at 25, ECF No. 34-7; Dep. of Lemley, Def.'s Ex. I at 45-46, ECF No. 34-9; Dep. of Miller at 25, Def. Ex. J at 25, ECF No. 34-10. In addition, Haluska would work alone on occasion during which he would also interface with customers to solve various software issues.

At the jobsite, Haluska's primary duties were to install and program software for voice and data networking systems, to modify the communications systems to meet the customers' specific needs, and to train the customers on how to use the product.[4] *See* Dep. of Weisser, Def.'s Ex. C at 55-59, 64-66, 87-88, ECF No. 34-3; Dep. of McKinney, Def.'s Ex. F at 70-71, ECF No. 34-6; Dep. of Pack, Def.'s Ex. G at 26-33; Dep. of Miller at 25-28, Def. Ex. J at 25, ECF No. 34-10; Dep. of Jouver, Def.'s Ex. K at 57-60, ECF No. 34-11. Haluska was also responsible for the completion of the installation as the "lead technician" on a complex job, although a project manager would oversee the work. *See* Dep. of Miller at 25-28, Def. Ex. J at 25, ECF No. 34-10. In such situations, Haluska would customize the software while his fellow engineers/technicians would physically install the wiring and cables. *See* Dep. of Galla, Def.'s Ex. H at 13-14, 21-22; Dep. of Jouver, Def.'s Ex. K at 57-60, ECF No. 34-11; Dep. of Reed, Def.'s Ex. L at 19-21, ECF No. 34-12. Additionally, Haluska had some limited involvement in maintaining Advent's local and wide area computing systems. *See* Dep. of Haluska, Def.'s Ex.

---

4. Haluska denies most of these facts and attempts to limit his job to a simplistic form of data entry. Pl.'s Resp. CSMF at 5, ECF No. 36. In support, Haluska cites to the deposition testimony of himself and Weisser. Although Weisser did characterize his work as akin to "data entry," Haluska's own deposition testimony makes clear that his job duties went well beyond simple data entry to include *inter alia* modifying software. *See* Dep. of Weisser, Pl.'s Ex. 5 at 133, ECF No. 37-5 ("It's not so much software modification as it is data entry. So that the software only operates a certain way by the manufacturer. You just have to enter the data to take advantage of the way that it operates. *So you may turn some functionality on, you may turn some functionality off, you may choose not to use some functionality.* So you're just entering data into existing software.") (emphasis added); *see also* Dep. of McKinney, Pl.'s Ex. 10 at 66-67, ECF No. 37-10.

4

D at 73-74, 164-65, Pl.'s Ex 1 at 137-38, ECF No 37-1. As Director of Technology, Weisser acted as the supervisor for the (Senior) Engineers, including Haluska.[5]

### 2. The Litigation

While still employed by Advent, Haluska commenced this lawsuit on July 30, 2013 by filing a two-count Complaint in which he alleged that Advent misclassified him as an exempt employee in violation of the Fair Labor Standards Act ("FLSA") and the Pennsylvania Wage Payment and Collection Law ("WPCL"). Haluska filed an Amended Complaint on December 31, 2013 to add a retaliation claim under the FLSA. The original Complaint was served on Advent on August 2, 2013. Thereafter, Eglberger approached Haluska on at least one occasion to discuss and resolve his concerns in an attempt to retain him as an employee.

After Haluska filed the original Complaint, his work schedule varied until he ultimately resigned several weeks later. Haluska first scheduled off on August 1-2, 2013 for unknown reasons; he returned to work the week of August 5-10, 2013; he then left again for a vacation; and he arrived back at Advent on Monday, August 19, 2013—the day on which he submitted his written resignation letter to Eglberger thanking him "for the opportunities for professional and personal development that [he has] provided [him] over the years." Def.'s Ex. E at ADV-00064, ECF No. 34-5 at 14.

### 3. The Alleged Adverse Employment Action(s)

Haluska claims that Advent retaliated against him after he filed the original Complaint. At this point in the narrative, certain facts (actually) became disputed.

---

5. Weisser did not directly oversee Haluska's work when they worked separate jobs at the same time. *See* Dep. of Weisser, Def.'s Ex. C at 146-48, ECF No. 34-3. Weisser thus did not know the specifics of Haluska's projects, such as how he interfaced with customers, what his day-to-day activities entailed, the level of sophistication of the job, or the software modifications that he conducted. *See id.* However, Weisser was aware that Haluska used Avaya IP Office and Communication Manager software on his projects. *See id* at 148.

Haluska first contends that Advent employees began to avoid him and stopped typical social and necessary work-related communications during the week of August 5, 2013 which created a hostile work environment. Among the alleged adverse employment actions, Haluska claims that "[w]hoever sends out the e-mail" scheduling service meetings omitted him from the distribution list after he filed suit.[6] *See* Dep. of Haluska, Pl.'s Ex. 1 at 169-72, ECF No. 371. Haluska also maintains that an unidentified coworker informed him that "they were instructed to watch what they say around me and to keep their noses clean." *Id.* at 172. And yet another unidentified coworker (or perhaps an AmWINS employee) apparently told Haluska that Advent "was looking to replace him."[7] *See id.* at 176; Am. Compl. at 16, ¶ 40, ECF No. 16.

The next so-called adverse employment action stems from an August 7, 2013 e-mail from Service Supervisor Mike Jouver to all "Techs." *See* Def.'s Ex. M at ADV-00301, ECF No. 34-13. The email states: "[a]nyone on vacation for a week at a time needs to leave their company vehicle in the office. Brad, Mike Lemley and myself have been trying to get the cars better maintained and it[']s a good time to do so." *Id.* Jouver also sent an e-mail directly to Haluska (which the latter calls a "cover-up") in which he explained the reasons that he made his service request. *See id.* at ADV-000538. Those e-mails were the first and last of their kind, leading Haluska to suggest that it was a directive from Advent's owner(s) to deprive Haluska of his company vehicle which was in for repairs just two months earlier.

---

6. By way of background, Advent requires all technicians to attend biweekly service meetings at which they discuss their current and upcoming projects. The parties do not dispute that it was not unusual for programmers to miss service meetings. Haluska claims that fellow-technicians Nick McKinney or Mike Miller informed him of the meeting(s) and inquired into his absence(s).

7. Plaintiff shifts his story as to who passed along this tip no less than three times: in his Complaint, he identifies an unnamed Advent employee; in his deposition, he cannot recall who notified him; and in his Responsive CSMF, he manages to name a customer / AmWins employee, Andre Fiano, as his source. *Compare* Am. Compl. at 16, ¶ 40, ECF No. 16 *with* Dep. of Haluska, Def.'s Ex. D at 176, ECF No. 14 *with* Pl.'s Resp. CSMF at 6, ¶ 21, ECF No. 36.

Additionally, Haluska claims that Advent denied him access to its Virtual Private Network ("VPN") when he was on vacation. Haluska similarly contended that Advent disabled his laptop and other devices, but he has since acknowledged that he was mistaken. The record is unclear as to whether (or why) he was denied access to the VPN.

The final alleged adverse employment action which Haluska cites is his supposed removal from two projects shortly after this litigation commenced: one with commission-generating AmWINS and another with IMortgage. Advent denies that it removed Haluska from the IMortgage job. As for the AmWINS project, Eglberger testified that Haluska was removed from that job because Advent could no longer trust him to show up for work. Advent also submits that Haluska's job performance toward the end of his employment jeopardized installations because he was not communicating, became difficult to track down, and walked off one job in June 2013. Notably, Advent began to document Haluska's purported infractions on August 5, 2013, apparently based on information received from Jouver and at the behest of Eglberger. *See* Dep. of Eglberger, Pl.'s Ex. 7 at Ex. E-11, ECF No. 37-7 (detailing six incidents between August 5-9, 2013).

### 4. Tiger Paw

During Haluska's employment at Advent, it required technicians to manually record their time worked in an electronic system known as "Tiger Paw." Haluska was no exception. From his perspective, Advent's policy was hardly followed and rarely enforced. In those situations, the system would automatically record the amount of time that the project manager had estimated for a particular job. Haluska did not independently maintain any contemporaneous record of the hours he worked while at Advent. Rather, he created an Excel spreadsheet "[r]ight before [he] filed the lawsuit" that reflected his best estimation of his overtime over the past three

7

years. Dep. of Haluska, Pl.'s Ex. 1 at 85, ECF No. 371. *See* Def.'s Ex. E, ECF No. 34-5 at 21. To produce that spreadsheet, Haluska relied upon Tiger Paw to review the previous projects on which he worked and calculated a "conservative number" as to the amount of hours he worked per week based upon the type of job he performed at that time. *See id.* at 86-109; *see also id.* at 225-226. Among the activities included in Haluska's overtime calculation are (generally) non-compensable events, such as his daily commute. *See id.* at 88-91. In total, Haluska claims that he is owed 2,146.10 hours of overtime compensation.[8]

### 5. Post-Advent Activity

Both Pack and Weisser left Advent in May 2013 and joined PGH Networks, LLC. After Haluska left Advent in August 2013, PGH Networks hired him to perform some work for or on behalf of the company. Advent later commenced a lawsuit against Haluska, Pack, Weiser, Giusspe Floro and PGH Networks in the Court of Common Pleas of Washington County, Pennsylvania in which it alleges violations of their non-compete agreements.

## II. Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing

---

8. Advent contests Haluska's claim of 2,146.10 hours of overtime based on its Tiger Paw records which show that Haluska worked 3,963 hours and 52 minutes in total from August 2010 through his late date of employment—an average of twenty-five hours of total reported work per week. *See generally Rosano v. Twp. of Teaneck*, 754 F.3d 177, 188 (3d Cir. 2014) (discussing the burden of proof an employee bears to recover damages for uncompensated overtime work). Moreover, Advent questions Haluska's ability to recollect the overtime hours he worked over a three-year span. *C.f. Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011*)* ("It is well settled among the district courts of this Circuit, and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection."). Based on its ruling as to the exemption(s), the Court need not reach this issue.

8

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

9

party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues of fact and, if so, whether they are both genuine and material. *Id.*

### III. Discussion

Advent moves for summary judgment on all three claims. The Court will address each count seriatim.

#### A. Count One: FLSA Overtime Compensation Claim

Under the FLSA, employees who work more than forty hours per week are entitled to overtime compensation unless they fall within one of the statutory exemptions. *See Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010) (citing 29 U.S.C. §§ 207, 213); *Pignataro v. Port Auth. of New York & New Jersey*, 593 F.3d 265, 268 (3d Cir. 2010) (citing 29 U.S.C. § 207(a)). "Congress has empowered the Secretary of Labor to define and delimit the terms of the FLSA's exemptions by regulation. 29 U.S.C. § 213(a). The Secretary's regulations, which were promulgated using notice-and-comment procedures, have controlling weight unless found to be arbitrary, capricious, or manifestly contrary to the statute." *Smith*, 593 F.3d at 284.

Exemptions from the FLSA are to be narrowly construed against the employer—*i.e.*, the employer bears the burden of establishing an exemption. *See Reich v. Gateway Press, Inc.*, 13 F.3d 685, 694 (3d Cir. 1994) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)); *see also Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1143 (3d Cir. 1983). "[I]f the

record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991). The ultimate determination as to whether an exemption applies is a mixed question of law and fact. *Pignataro v. Port Auth. of New York & New Jersey*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reich*, 13 F.3d at 691).

### 1. The Computer Professional Exemption

Among the statutory exemptions from the FLSA's overtime requirements on which Defendant relies are for those persons employed as computer professionals. *See* 29 U.S.C. § 213(a)(17); *see, e,g.*, *Ross v. Creative Image Technologies, LLC*, No. 3:13-CV-00003-CRS, 2014 WL 2890467, at *4 (W.D. Ky. June 25, 2014). The FLSA provides that an employee is not entitled to overtime compensation if he or she meets the following definition:

> (17) any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is—
>
> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
>
> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and
>
> who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.

*Id.* Where, as here, an employee receives a salary rather than an hourly rate, district courts have disagreed as to whether this exemption applies. *See Chicca v. St. Luke's Episcopal Health Sys.*,

11

858 F. Supp. 2d 777, 783 n.3 (S.D. Tex. 2012) (collecting cases); *compare Santiago v. Amdocs, Inc.*, C 10-4317 SI, 2011 WL 6372348, at *3 (N.D. Cal. Dec. 19, 2011) *with Pellerin v. Xspedius Mgmt. Co. of Shreveport L.L.C.*, 432 F. Supp. 2d 657, 665 n.9 (W.D. La. 2006).

For example, in *Santiago*, the district court found that "[f]ederal regulations explicitly state that the computer employee exemption under § 213(a)(17) only applies to hourly employees." 2011 WL 6372348, at *3. The applicable regulation, entitled "General rule for computer employees" provides as follows:

> (b) The section 13(a)(1) exemption applies to any computer employee compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities, *and the section 13(a)(17) exemption applies to any computer employee compensated on an hourly basis at a rate not less than $27.63 an hour*.

*Id.* (quoting 29 C.F.R. § 541.400) (emphasis in original). Based on the so-called "plain language of the statute and the regulations"—seemingly, the exclusion of "compensated on a salary basis" from the italicized text—the *Santiago* Court held that "the § 213(a)(17) exemption only applies to hourly employees, and thus plaintiffs do not fall under that exemption." *Id.*

At least one other district court has adopted a contrary interpretation of the exemption. *See Pellerin*, 432 F. Supp. 2d at 665 n.9. In *Pellerin*, the district court noted that "[o]ne could argue that the last clause of § 213(a)(17) limits the exemption to those who earn at least $27.63 per hour. *Id.* (citing 29 C.F.R. § 541.400 (2004)). The district court nevertheless read the last clause of the regulation "as imposing an additional requirement only for those employed on an hourly basis," remarking that "[t]his interpretation is consistent with legislative comments addressing similar language in the 1990 legislation, and the DOL's resolution of same." *Id.* (citing 57 FR 46742 (10/9/1992)).

And yet another district court has taken a third approach. *See Chicca*, 858 F. Supp. 2d at 783 n.3. In *Chicca*, the district court recognized the split of authority on this issue but declined to weigh in on whether the exemption applies to salaried employees "[b]ecause the regulations apply the same standard to computer employees whether a court evaluates their FLSA claim under 213(a)(1) or 213(a)(17)." *Id.* (citing 29 C.F.R. § 541.400(b)). *See also Bergquist v. Fid. Info. Servs., Inc.*, 399 F. Supp. 2d 1320, 1330 (M.D. Fla. 2005), *aff'd*, 197 F. App'x 813 (11th Cir. 2006). This Court will follow this approach.[9]

Here, this Court finds that Haluska is a "similarly skilled worker" whose primary duties include a combination of those covered in 29 U.S.C. § 213(a)(17). Although Haluska maintains that he spent most of time performing "help desk"-like functions, his own deposition testimony contradicts his more recent position. By his own admission, Haluska's primary job duties included consulting with customers at precut meetings to discuss and determine hardware specifications and system functions as well as programming / modifying the related software to meet their needs—all exempted responsibilities under § 213(a)(17). In addition to installing the voice systems and data networking, Haluska also assisted in maintaining Advent's local and wide area computing systems and interacted with clients on-site to address issues with the system(s). The record thus clearly reflects that, even if Haluska was not a "computer systems analyst, computer programmer, software engineer" in the more traditional sense, he undoubtedly qualifies as a "similarly skilled worker" who performed a combination of duties described in 29

---

9. To be clear, under 29 C.F.R. § 541.400(b), "computer employees can be exempt under the professional exemption in 29 U.S.C. § 213(a)(1) if they meet the minimum salary requirements of $455.00 a week, or under the computer employee exemption, 29 U.S.C. § 213(a)(17), if they meet the minimum hourly requirement of $27.63." *Bergquist v. Fid. Info. Servs., Inc.*, 399 F. Supp. 2d 1320, 1330 (M.D. Fla. 2005), *aff'd*, 197 F. App'x 813 (11th Cir. 2006). Thus, regardless of which section controls, the exemption applies only to computer employees whose primary duty meet the four requirements set forth in the statute and reiterated in the regulations. *See* 29 U.S.C. §§ 213(a)(17)(A)-(D); 29 C.F.R. §§ 541.400(b)(1)-(4).

U.S.C. § 217. Accordingly, the Court will grant summary judgment as to Count One of the Amended Complaint.

### 2. The Administrative Exemption

Advent also relies on the FLSA's exemption for any employee employed in a bona fide administrative capacity. *See* 29 U.S.C. § 213(a)(1)); 29 C.F.R. §§ 541.200-203; *see also Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 n.22 (7th Cir. 2012) (discussing the administrative/production dichotomy analysis) (citing *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991); *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22122, 22141 (2004)); *Swartz v. Windstream Commc'ns, Inc.*, 429 F. App'x 102, 104-05 (3d Cir. 2011) (holding that a sales engineer who custom-designed telecommunications platforms met the requirements of the administrative exemption). Because Haluska meets the computer professional exemption, there is no need to address whether he would also qualify under the administrative exemption.

### B. Count Two: WPCL Overtime Compensation Claim

The purpose of the WPCL "is to allow employees to recover wages and other benefits that have already been earned and are due from employers pursuant to existing agreements between the parties." *Mavrinac v. Emergency Med. Ass'n of Pittsburgh*, 2:04 CV 1880, 2005 WL 2304995, at *8 (W.D. Pa. Sept. 21, 2005). The WPCL "does not create a right to compensation," but it instead "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003), *as amended* (Nov. 14, 2003) (citations omitted). *See* 43 Pa. Stat. Ann. §

260.1, *et seq.* "The contract between the parties governs in determining whether specific wages are earned." *Id.*

Here, Haluska's WPCL claim is based on alleged violations of federal law rather than an express or implied employment contract. *See* Am. Compl. at 5, ¶¶ 31-33, ECF No. 16. Several district courts have dismissed similar statutorily-based claims for overtime compensation brought under the WPCL. *See Drummond v. Herr Foods Inc.*, CIV.A. 13-5991, 2014 WL 80729, at *2 (E.D. Pa. Jan. 9, 2014) (collecting cases); *see also Pieretti v. Dent Enterprises, Inc.*, CIV.A. 11-2179, 2013 WL 754436, at *4 (E.D. Pa. Feb. 27, 2013), *aff'd*, 553 F. App'x 244 (3d Cir. 2014) (rejecting Plaintiff's argument "that his contract with [his employer] impliedly obligated [it] to comply with the law, thus mandating overtime pay if [he] was not an exempt employee under the PMWA" because Plaintiff "produced no evidence of any contractual obligation on the part of [Defendant] to pay him overtime wages."); *Scott v. Bimbo Bakeries, USA, Inc.*, No. CIV.A. 10-3154, 2012 WL 645905, at *5 (E.D. Pa. Feb. 29, 2012) ("Plaintiffs alleged entitlement to minimum wage and overtime payments is based on federal and state statutory provisions, not the contract at issue, and therefore does not provide a basis to proceed under the WPCL."); *Carpenter v. R.M. Shoemaker Co.*, No. CIV.A. 00-5644, 2002 WL 987990, at *7 (E.D. Pa. May 6, 2002) (granting summary judgment when "Plaintiff's WPCL claim is by force of the FLSA"). The Court finds those decisions instructive. Thus, in the absence of a contractual right to overtime wages, the Court will grant summary judgment as to Count Two of the Amended Complaint.

### C. Count Three: FLSA Retaliation Claim

The FLSA also includes an anti-retaliation provision that makes it unlawful for an employer

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;

29 U.S.C.A. § 215(a)(3). In analyzing an unlawful retaliation claim under the FLSA, courts look to the familiar burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x. 94, 95 (3d Cir. 2002).

Under that framework, the employee must first establish the three elements of a *prima facie* case: "(1) the employee engaged in protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Wildi v. Alle-Kiski Med. Ctr.*, 659 F. Supp. 2d 640, 664 (W.D. Pa. 2009) (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)). If the plaintiff satisfies these elements, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable employment decision. *Smith v. City of Allentown*, 589 F.3d 684, 689-90 (3d Cir. 2009). The burden of production then returns to the plaintiff who must show by a preponderance of the evidence that the employer's proffered reason was pretextual. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citing *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)).

The parties dispute whether Haluska has satisfied the second element of the prima facie case, which requires a plaintiff to "show that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).[10] "Materially adverse" means that it well might have dissuaded a reasonable worker

---

10. Although *Burlington Northern* was decided in the Title VII context, courts have looked to that case in interpreting the FLSA. *See, e.g.*, *Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008) ("[W]e find no significant differences in either the language or intent of the two statutes regarding the type of adverse action their

from engaging in protected activity. *See id*. This standard, as the Supreme Court noted, is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69. *See, e.g. id.* ("A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.").

The materiality aspect also separates significant injuries from trivial harms. *See id.* at 68. As the Supreme Court has observed, statutes designed to protect employees in the workplace "do[ ] not set forth 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). Personality conflicts that generate antipathy, snubbing by supervisors and co-workers, simple lack of good manners, and those "petty slights or minor annoyances that often take place at work and that all employees experience" are thus not actionable under the anti-retaliation provision of the statute. *See id.*[11]

Based upon the Court's independent review, it finds that the record contains a tangle of allegations and attestations about what actually occurred after Haluska filed his original Complaint. For example, there are genuine disputes about whether Advent excluded Haluska from the biweekly service meetings, whether it denied him access to its VPN network, whether it attempted to restrict his advancement within the company, and whether (or why) it removed him

---

retaliation provisions prohibit."). The Court must, however, "be mindful 'to respect any differences in language and purpose between Title VII and the FLSA.'" *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 73 (D.D.C. 2009) (quoting *Darveau*, 515 F.3d at 342).

11. Haluska is advised to take notice of the Supreme Court's observations in *Burlington Northern & Santa Fe Railway. Co. v. White* regarding *material* adversity. *C.f.* Pl.'s Br. at 13, ECF No. 35 ("Fellow employees had stopped speaking with Plaintiff prior to the time he left for vacation.").

from the commission-generating AmWINS project / the IMortgage job.[12]  Several of these allegations, if true, may rise to a materially adverse employment action.  The Court cannot, however, unravel those disputed factual issues without first weighing evidence and making credibility determinations—but those functions are prohibited at this stage of the proceedings.  Accordingly, the Court will deny summary judgment as to Count Three of the Amended Complaint.

**IV.   Conclusion**

For the reasons hereinabove set forth, the Court will grant in part and deny in part Defendant's motion for summary judgment.  An appropriate Order follows.

McVerry, J.

---

12.  Contrary to Haluska's suggestion, the Washington County lawsuit has never been asserted as a retaliatory action in this case.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK HALUSKA, | ) |
| Plaintiff, | ) 2:13-cv-1104 |
| v. | ) |
| ADVENT COMMUNICATIONS, INC., | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this 10th day of November, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION FOR SUMMARY JUDGMENT (ECF No. 31) filed by Defendant Advent Communications, Inc. is **GRANTED IN PART AND DENIED IN PART** as follows: the motion for summary judgment as to Count One and Count Two is **GRANTED**; and the motion for summary judgment as to Count Three is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff shall file a pre-trial narrative statement on or before Monday, December 8, 2014; and Defendant shall file a pre-trial narrative statement on or before Monday, December 29, 2014. A pre-trial conference is scheduled before the undersigned on Friday, January 2, 2015 at 9:30 AM in Courtroom 6C, United States Courthouse, 700 Grant Street, Pittsburgh, PA 15219.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Charles A. Merchant**
Email: merchant@mmklegal.com
**George Basara**
Email: george.basara@bipc.com
**Theresa L. Wasser**
Email: tlwasser@gmail.com